FILED

2012 NOV 30 A 11: 59

ISS

YGR

1  AVI WAGNER (226688)
2  THE WAGNER FIRM
   1925 Century Park East, Suite 2100
3  Los Angeles, CA 90067
   Tel: (310) 491-7949
4  Email: avi@thewagnerfirm.com

5  Counsel for Plaintiff
6  [Additional Counsel on Signature Page]

7            UNITED STATES DISTRICT COURT
8            NORTHERN DISTRICT OF CALIFORNIA

9   DAVIN POKOIK, Individually and on        No.
10  Behalf of All Others Similarly Situated,       C 12      6074

                                            CLASS ACTION
11                             Plaintiff,
                                            COMPLAINT FOR VIOLATION OF
12          v.                              THE FEDERAL SECURITIES LAWS

13                                          DEMAND FOR JURY TRIAL
14  HEWLETT-PACKARD COMPANY,
    AUTONOMY CORPORATION PLC,
15  DELOITTE LLP, LEO APOTHEKER,
    MARGARET C. WHITMAN,
16  CATHERINE A. LESJAK, JAMES T.
    MURRIN, MICHAEL R. LYNCH, and
17  SUSHOVAN HUSSAIN,

18                             Defendants.
19
20
21
22
23
24
25
26
27
28

FILED BY FAX
PURSUANT TO LOCAL RULES



Plaintiff Davin Pokoik ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hewlett-Packard Company ("HP" or the "Company"), analysts' reports and advisories about the Company, information readily obtainable on the Internet, public filings of Autonomy Corporation plc ("Autonomy") including its annual reports for financial years 2009 and 2010. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired HP securities between August 19, 2011 and November 19, 2012, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.     HP provides imaging and printing systems, computing systems, and information technology services for business and personal use. The Company's products include laser and inkjet printers, scanners, copiers and faxes, personal computers, workstations, storage solutions, and other computing and printing systems.

3. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) at the time the Company acquired Autonomy, Autonomy's reported operating results and historic growth were the product of accounting improprieties, including the mischaracterization of revenue from negative-margin, low-end hardware sales with little or no associated software content as "IDOL product and the improper recognition of revenue on transactions with business partners where no end-user customers existed at the time of sale; (ii) at the time the Company had agreed in principle to acquire Autonomy, HP was looking to unwind the deal due to potential accounting improprieties discovered in Autonomy's financial statements; (iii) the Company engaged in inadequate due diligence during the Autonomy acquisition and, as a result thereof, the Company materially overpaid for Autonomy; (iv) the Company's reported goodwill and acquired intangible assets were overstated and would have to be written down; (v) Autonomy's operating margin for its Enterprise Services segment was collapsing for several reasons, including unfavorable revenue mix and underperforming contracts; (vi) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; and (vii) beginning in May 2012, based upon detailed allegations provided by a whistleblower who was a former Autonomy executive, the Company had commenced an internal investigation regarding accounting fraud at Autonomy.

4. On November 20, 2012, the Company disclosed a non-cash impairment charge of $8.8 billion related to the Company's acquisition of Autonomy due, in large part, to Autonomy's use of "accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company" in an attempt to attract a purchaser.

Moreover, the Company disclosed for the first time that beginning in May, 2012, HP had commenced an internal investigation regarding possible accounting fraud at Autonomy.

5. On this news, HP shares declined $1.59 per share or nearly 12%, to close at $11.71 per share on November 20, 2012.

6. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as HP' principal place of business is located within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11. Plaintiff, as set forth in the attached Certification, acquired HP securities at artificially inflated prices during the Class Period and has been damaged thereby.

12. Defendant HP is a Delaware corporation with principal executive offices located at 3000 Hanover Street, Palo Alto, CA 94304. HP' common stock trades on the New York

4

Stock Exchange ("NYSE") under the ticker symbol "HPQ."

13.    Defendant Autonomy was a company incorporated in England and Wales. The registered office was at Autonomy House, Cambridge Business Park, Cowley Road, Cambridge CB4 OWZ, UK. The Company was acquired by HP on October 3, 2011.

14.    Defendant Deloitte LLP ("Deloitte"), the U.K. affiliate of Deloitte Touche Tohmatsu, served as Autonomy's independent auditor prior to and during HP's acquisition of Autonomy.

15.    Defendant Leo Apotheker ("Apotheker") was the Company's Chief Executive Officer ("CEO") and President from November 2000 to September 2011.

16.    Defendant Margaret C. Whitman ("Whitman") has been the Company's President and CEO since September 22, 2011. Prior to being named the Company's CEO, Defendant Whitman served as a director on the Company's Board of Directors ("Board") and continues to serve as a director.

17.    Defendant Catherine A. Lesjak ("Lesjak") was, at all relevant times, the Company's Chief Financial Officer and Executive Vice President.

18.    Defendant James T. Murrin ("Murrin") was the Company's Senior Vice President, Chief Accounting Officer and Controller until May 1, 2012. During the Class Period, Defendant Murrin sold 132,500 shares of his HP stock for proceeds of nearly $3.5 million while in the possession of materially adverse and non-public information.

19.    Defendant Michael R. Lynch ("Lynch") served as the Company's Executive Vice President, Information Management between November 2011 and May 2012. From 1996 through October 2011, Defendant Lynch was Autonomy's Chief Executive Officer and Co-Founder.

20.     Defendant Sushovan Hussain ("Hussain") served as Autonomy's Chief Financial Officer from June 2001 through October 2011.  Defendant Hussain was appointed a director on Autonomy's Board in June 2003.

21.     The defendants referenced above in ¶¶ 15 -20 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.     HP is a leading global provider of products, technologies, software, solutions and services to individual consumers, small and medium sized businesses and large enterprises, including customers in the government, health and education sectors.   The Company's operations are organized into seven business segments: the Personal Systems Group; Services; the Imaging and Printing Group; Enterprise Servers; Storage and Networking; HP Software; and HP Financial Services and Corporate Investments.

23.     In Autonomy's annual reports for years 2009 and 2010, Autonomy stated the following regarding its revenue recognition policy:

> The group discloses revenue within two categories, namely sale of goods and rendering of services, as required by IAS 18.... Revenue is measured at the fair value of the consideration received or receivable and represents amounts receivable for goods and services provided in the normal course of business, net of discounts and sales taxes. Deferred revenues primarily relate to archiving and customer support and maintenance fees, which have been invoiced to the customer prior to the performance of these obligations.  Deferred revenue is recognised rateably over the term of the contract, usually over a period of one to three years.

24.     Significantly, these statements, as well as the entirety of Autonomy's 2009 and 2010 annual reports, were incorporated by reference in the Offering Documents published by HP on August 18, 2011, which described the terms of the proposed Autonomy acquisition, and were relied upon by HP's investors.  Autonomy's annual reports for the years 2009 and 2010

1    contained Independent Auditor's Reports which were signed by Deloitte.  For example, for the

2    year 2010, the Independent Auditor's Report signed by Deloitte dated February 22, 2011 stated

3    that in its opinion, Autonomy's "financial statements give a true and fair view of the state of the

4    group's and of the parent company's affairs as at 31 December 2010 and of the group's profit

5

6    for the year then ended."

### Materially False and Misleading
### Statements Issued During the Class Period

9        25.     On August 18, 2011, after the market closed, the Company announced in a press

10   release that it would acquire all of the outstanding shares of Autonomy for £25.50 or $42.11 per

11   share in a cash offer, representing an enterprise value of approximately $11 billion.  The press

12   release stated in relevant part the following:

13

14           The transaction was unanimously approved by the boards of directors of both HP
             and Autonomy. The Autonomy board of directors also has unanimously
15           recommended its shareholders accept the Offer.

16           Based on the closing stock price of Autonomy on August 17, 2011, the
17           consideration represents a one day premium to Autonomy shareholders of
             approximately 64 percent and a premium of approximately 58 percent to
18           Autonomy's prior one month average closing price. The transaction will be
             implemented by way of a takeover offer extended to all shareholders of
19           Autonomy. A document containing the full details of the Offer will be dispatched
20           as soon as practicable after the date of this release. The acquisition of Autonomy
             is expected to be completed by the end of calendar 2011.

21

22                                            ***

23           "Autonomy presents an opportunity to accelerate our strategic vision to
             decisively and profitably lead a large and growing space," said Léo Apotheker,
24           HP president and chief executive officer. "Autonomy brings to HP higher value
25           business solutions that will help customers manage the explosion of information.
             Together with Autonomy, we plan to reinvent how both unstructured and
26           structured data is processed, analyzed, optimized, automated and protected.
             Autonomy has an attractive business model, including a strong cloud based
27           solution set, which is aligned with HP's efforts to improve our portfolio mix. We
             believe this bold action will squarely position HP in software and information to

28

                                             7

create the next-generation Information Platform, and thereby, create significant value for our shareholders."

Apotheker continued, "Autonomy is a highly profitable and globally respected software company, with a well-regarded management team and talented, dedicated employees. We look forward to partnering with a company who shares our commitment to solving customer problems by creating smart, cutting-edge products and solutions. I am particularly pleased that Dr. Mike Lynch, who heads a team of brilliant scientists and employees, will continue to lead Autonomy. I look forward to our collaboration as we focus on creating maximum value for the combined company, its customers and employees."

"This is a momentous day in Autonomy's history," said Dr. Mike Lynch, chief executive officer and founder, Autonomy. "From our foundation in 1996, we have been driven by one shared vision: to fundamentally change the IT industry by revolutionizing the way people interact with information. HP shares this vision and provides Autonomy with the platform to bring our world-leading technology and innovation to a truly global stage, making the shift to a future age of the information economy a reality."

**Strategic and financial benefits**

- Positions HP as leader in large and growing space: Autonomy has a strong position in the $20 billion enterprise information management space, which is growing at 8 percent annually and is uniquely positioned to continue growth within this space. Furthermore, key Autonomy assets would provide HP with the ability to reinvent the $55 billion business analytics software and services space, which is growing at 8 percent annually.
- Complements HP's existing technology portfolio and enterprise strategy: Autonomy offers solutions that are synergistic across HP's enterprise offerings and strengthens capabilities for data analytics, the cloud, industry capabilities and workflow management. This will bolster HP's cloud offerings with key assets for information management and data analytics. Autonomy also complements existing HP offerings from enterprise servers, storage, networking, software, services and its Imaging and Printing Group (IPG).
- Provides differentiated IP for services and extensive vertical capabilities in key industries: Acquiring Autonomy would provide differentiated IP for services, including extensive vertical capabilities in key industries such as government, financial services, legal, pharmaceutical and healthcare.
- Provides IPG a base for content management platforms: Autonomy provides HP with a content management platform and accelerates a major component of the IPG enterprise strategy to continue its growth of document and content management and higher value commercial printing opportunities.
- Enhances HP's financial profile: Autonomy's strong growth and profit margin profile complements HP's efforts to improve its business mix by focusing on enterprise software and solutions. Autonomy has a consistent track record of

8

double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010.

• Accretive to HP's earnings: HP expects the acquisition to be accretive to non-GAAP earnings per share for HP shareholders in the first full year following completion.

26.    On August 18, 2011, the Company issued a press release announcing financial results for the third fiscal quarter ended July 31, 2011. For the fourth quarter, the Company reported net earnings of $1.9 billion, or $0.93 diluted earnings per share ("EPS"), and net revenue of $31.2 billion, as compared to net earnings of $1.8 billion, or $0.75 diluted EPS, and net revenue of $30.7 billion for the same period a year ago.

27.    Also on August 18, 2011, the Company conducted a conference call with analysts. During the call, Defendant Apotheker represented the following:

This is a milestone moment because there is a very real and concrete need for our customers to address the explosion of unstructured and structured information. Autonomy's intelligent data operating layer is in effect the standard on more than 400 OEMs and is supported by substantial IP. Additionally, the Autonomy platform pulls structured and unstructured data from a broad range of sources.

And they offer their products via both traditional software license and cloud mode.

Autonomy today is one of the largest cloud players of over 30 betabytes of customer information under management by their cloud-based archiving and backup solutions. They have over 25,000 customers globally. Autonomy sees the information transformation and subsequent market opportunity exactly as we do. Moreover, Autonomys business is well-aligned to HP's effort to change and focus our business mix.

In 2010, Autonomy had gross margins in the high 80s and operating margins above 40%. They have demonstrated a strong consistent track record of double-digit revenue growth. Mike Lynch, Autonomy's Cofounder and CEO, heads a team of brilliant scientists and employees. Additionally, operationally, the 2 companies and cultures will blend together well. Reporting directly to me, Mike will continue to lead Autonomy, which will continue to operate separately so we can keep them focused on their own market momentum, while at the same time they can play a key role in enabling the opportunities we see in the strategy we've outlined for HP.

9

As an executive who has spent most of my career primarily in software, this is a world I know well. Some acquisitions require heavy lifting, but bringing Autonomy into the HP world will be seamless and highly complementary. We believe this transaction will unlock synergies, which in Autonomy and the HP Enterprise offerings including ESSN, software services and IPG and across multiple industry verticals. We are building a strong HP Software business. We have done so through successful acquisitions like ArcSight and Fortify. We have had excellent growth and performance this year from our software unit, so the acquisition of Autonomy will build on that momentum and accelerate our HP Software strategy.

We all have witnessed an increased level of market volatility and especially today. So you might ask if a move like Autonomy is right in this market. But the market fluctuations does not changed the underlying opportunity, the value proposition of HP and Autonomy and the need to transform HP's business to create a stronger company. And most importantly, we very strongly believe the transaction will create significant value for our shareholders.

All of the decisive moves I've made provide HP with the most shareholder return, markets where we can demonstrate a sustainable competitive advantage, maximize customer value, deliver on our solutions vision, differentiate with IP and win.

28.    On September 9, 2011, HP filed a quarterly report for the fiscal third quarter ended July 31, 2011 on a Form 10-Q with the SEC, which was signed by Defendant Lesjak and reiterated the Company's previously announced financial results.    In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Apotheker and Lesjak stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.    The 10-Q represented the following in relevant part:

We are investing for growth by strengthening our position in our core markets and accelerating growth in adjacent markets in anticipation of market trends, such as cloud computing, unstructured data, data center consolidation and automation, digitization, analytics and IT security. In addition, in May 2011, we announced that we are going to make changes to our services business, including accelerating portfolio investments in higher value services, enhancing our sales and delivery

capabilities, and better aligning our services strategy with HP's overall strategy to better enable us to meet the needs of our customers. We are also creating innovative new products and developing new channels to connect with our customers. In addition, we have been making focused investments in innovation to strengthen our portfolio of products and services that we can offer to our customers, both through organic investments as well as through acquisitions, including our recently announced offer to acquire all of the issued and to be issued share capital of Autonomy Corporation plc ("Autonomy"). Once completed, the addition of Autonomy is expected to accelerate HP's offerings in cloud-based solutions and software that address the changing needs of businesses and support the IPG enterprise strategy to continue its growth in document and content management. These investments will allow us to expand in higher margin and higher growth industry segments and further strengthen our portfolio of hardware, software and services.

***

Services net revenue increased 3.6% (decreased 1.9% when adjusted for currency) and 1.0% (decreased 1.4% when adjusted for currency) for the three and nine months ended July 31, 2011, respectively. Infrastructure Technology Outsourcing net revenue increased by 5% and 2% for the three and nine months ended July 31, 2011, respectively. An increase in product-related revenue and a favorable currency impact were partially offset by a shortfall in short-term project contracts with existing clients. Technology Services net revenue increased by 5% and 2% for the three and nine months ended July 31, 2011, respectively, due primarily to growth in our consulting business and a favorable currency impact, the effect of which was partially offset by reduced sales of third-party hardware. Application Services net revenue increased by 2% and 1% for the three and nine months ended July 31, 2011, respectively. The increase for both periods was driven by a favorable currency impact, the effect of which was partially offset by declines in short-term project work and primarily to the ExcellerateHRO divestiture completed at the end of the third quarter of fiscal 2010.

30.     On or about September 14, 2011, HP filed a prospectus on Form 424B5 with the SEC for the offer and sale of $4.6 billion in fixed- and floating-rate notes with maturities reaching out to September 15, 2041. The prospectus informed investors that the proceeds of the $4.6 billion offering would "be used to facilitate the funding of our proposed acquisition of Autonomy [and any] proceeds from the sale of the Global Notes that are not used to fund the Autonomy acquisition will be used for general corporate purposes." The September 13, 2011 prospectus incorporated by reference management's discussion and analysis of the Services

segment's financial performance as reported in the Company's third quarter 2011 Form 10-Q, which stated in relevant part:

> Services net revenue increased 3.6% (decreased 1.9% when adjusted for currency) and 1.0% (decreased 1.4% when adjusted for currency) for the three and nine months ended July 31, 2011, respectively. Infrastructure Technology Outsourcing net revenue increased by 5% and 2% for the three and nine months ended July 31, 2011, respectively. An increase in product-related revenue and a favorable currency impact were partially offset by a shortfall in short-term project contracts with existing clients. Technology Services net revenue increased by 5% and 2% for the three and nine months ended July 31, 2011, respectively, due primarily to growth in our consulting business and a favorable currency impact, the effect of which was partially offset by reduced sales of third-party hardware. Application Services net revenue increased by 2% and 1% for the three and nine months ended July 31, 2011, respectively. The increase for both periods was driven by a favorable currency impact, the effect of which was partially offset by declines in short-term project work and primarily to the ExcellerateHRO divestiture completed at the end of the third quarter of fiscal 2010.

31.    Also on September 13, 2011, Defendant Apotheker participated at the Deutsche Bank Technology Conference and represented the following in relevant part:

> Autonomy – I'm sure we have many more questions on Autonomy, but, just to position that squarely in everybody's minds, the idea around Autonomy is to really strengthen HP's capabilities tremendously in this whole notion of data. We talked about data in San Francisco. We will talk a lot about data, probably, today, as well, structured and unstructured. And, therefore, Autonomy is a very important asset.
>
> ***
>
> And let me just try to build on that and help you understand how we came to the valuation of Autonomy. *We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this. Just to make sure everybody understands. Autonomy will be, on day one, accretive to HP. For FY 2012, Autonomy, once we integrate it, is accretive to HP.*
>
> Now, we have identified five synergy possibilities – five synergy leverages on how we can build up the Autonomy business and how we can synergize it between HP and Autonomy. And I can walk you through that, through these various elements. But just take it from us. We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy. And it will give a great return to our shareholders.

***

[WHITMORE:] You're in the midst of repositioning [Enterprise Services]. Can you talk about where you are today in that process, what the end goal is? What do you hope to turn EDS into?

[APOTHEKER:] Okay. It's not EDS anymore; it's HP Enterprise Services. And the segment we report is that business, our enterprise services, and our technical services. We bring it all together in the segment service that you see in the reporting.

So, what are we trying to do? Currently, our HP EDS – former EDS business is heavily skewed towards outsourcing. We are trying to shift this balance over time and it has to be gradual, because in service businesses, things move gradually to a more balanced portfolio approach. We will be providing on top of our outsourcing businesses – or alongside our outsourcing businesses additional, higher-added-value service, be it clouds – we want to put a lot of focus on clouds – application migrations towards the clouds, application modernization, and, in fact, provide more IP for our customers as well.

(emphasis added).

32.     On September 22, 2011, HP terminated Defendant Apotheker as its CEO and announced that Defendant Whitman would take over as the Company's new President and CEO.

33.     On September 22, 2011, the Company hosted a conference call where Defendant Whitman stated the following in relevant part:

Second, the Autonomy acquisition, which I'm excited about, is proceeding as planned, and is expected to be completed by the end of the calendar year.

34.     On October 3, 2011, the Company issued a press release announcing that it had acquired control of Autonomy. The press release stated the following in relevant part:

Holders of 213,421,299 Autonomy shares have accepted HP's previously announced offer to purchase the entire share capital of Autonomy at a price of £25.50 per share in cash, representing approximately 87.34 percent of the current issued share capital of Autonomy. As such, all conditions relating to the offer have now been satisfied, allowing HP to acquire control of Autonomy.

The acquisition positions HP as a leader in the large and growing enterprise information management space. Autonomy's software offerings power more than 25,000 customer accounts worldwide and, as part of HP, will provide high-value business solutions to help customers manage the explosion of unstructured and structured information. Autonomy offers solutions that are complementary across

13

HP's enterprise offerings and strengthens the company's data analytics, cloud, industry and workflow management capabilities.

"We are committed to helping our customers solve their toughest IT challenges. The exploding growth of unstructured and structured data and unlocking its value is the single largest opportunity for consumers, businesses and governments," said Meg Whitman, HP president and chief executive officer. "Autonomy significantly increases our capabilities to manage and extract meaning from that data to drive insight, foresight and better decision making."

As previously announced, Autonomy will operate as a separate business unit. Dr. Mike Lynch, the founder and chief executive officer of Autonomy, will continue to lead the Autonomy business and will report to Whitman.

"This is a historic day for Autonomy, our employees and the customers we serve, as we combine HP's phenomenal assets and Autonomy's specialized skills to produce systems that handle all the information in the enterprise, regardless of the format it is in," said Lynch. "We are at the dawn of a new era when it is the 'I' in IT that is changing, not just the 'T.'"

35.    On November 21, 2011, the Company issued a press release announcing financial results for the fiscal year ended October 31, 2011. For the fourth quarter, the Company reported net earnings of $239 million, or $0.12 diluted EPS, and net revenue of $32.1 billion, as compared to net earnings of $2.5 billion, or $0.1.10 diluted EPS, and net revenue of $33.3 billion for the same period a year ago. For the fiscal year, the Company reported net earnings of $7.1 billion, or $3.32 diluted EPS, and net revenue of $127.2 billion, as compared to net earnings of $8.8 billion, or $3.69 diluted EPS, and net revenue of $126 billion for the same period a year ago.

36.    Also on November 21, 2011, the Company conducted a conference call with analysts. During the call, Defendant Whitman represented the following:

[W]e closed the Autonomy acquisition on October 3. In the last month, we've had hundreds of leads passed between the two companies, and we've created a new information management business group that combines Autonomy, Vertica, and other HP software assets under Mike Lynch, and reports directly to me.

***

14

Well let me just spend a moment on Autonomy. I am really excited about this acquisition. *As you all know, I think it really positions HP as a leader in the Next-generation information management and analytics capabilities, as the explosion of data is making these capabilities absolutely critical. Autonomy is a unique asset.* It has a remarkable ability to manage unstructured information in a way that no one else in the market does. I think that adds a lot of value not only in their space but actually across HP.

So, what we've set up is Autonomy is actually running fairly autonomously (laughter) but we have done a great job I think of integrating the go-to market. So, there are sales leads that are going from Autonomy to HP – interestingly, which we didn't expect so much of in terms of a hardware pull-through – but also from our HP sales team back to Autonomy. We've got a clearing house that vets all those leads. So, that what we turn over to Autonomy are really high quality leads that will allow Autonomy to grow much faster than they would have grown on their own. That's the name of the game for 2012.

There's going to be lots of other things we do together but accelerating the growth of Autonomy using the distribution capability of HP is priority number one, two and three for 2012.

\*\*\*

First, we increased our investment levels through fiscal-year 2011 because there are areas where HP had previously under-invested. This is a big reason why our services margins have been coming down and remain pressured.

37.     During the call, Defendant Lesjak represented the following:

We closed the acquisition of Autonomy in October, and therefore, we had roughly one month of results in the software numbers. *The integration is going well thus far, and we are focused on enabling our global sales force to ramp on the Autonomy product line-up, so they can begin selling Autonomy software in fiscal '12.*
\*\*\*
HP services delivered revenue of $9.3 billion, up 2% from the prior year quarter, but down 1% in constant currency. Operating profit of $1.2 billion, or 12.8% of revenue, was down 360 basis points from the prior year. Our services turnaround will take time as we work to shift the business mix toward higher growth, higher margin services. IT outsourcing revenue of $3.9 billion was up 1% year-over-year.

38.     On December 7, 2011, the Company filed a prospectus on Form 424B5 with the SEC for the offer and sale of $3.0 billion in fixed-rate notes with maturities reaching out to December 9, 2021. The prospectus informed investors that the proceeds of the $3.0 billion

offering would be "for general corporate purposes." The December 7, 2011 prospectus incorporated by reference management's discussion and analysis of the Services segment's financial performance during the third quarter of 2011.

39.     On December 14, 2011, HP filed an annual report for the fiscal year ended October 31, 2011 on a Form 10-K with the SEC, which was signed by, among others, Defendants Whitman and Lesjak and reiterated the Company's previously announced financial results.     In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Whitman and Lesjak stating that the information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     The Form 10-K stated the following in relevant part:

HP's largest acquisition in fiscal 2011 was its acquisition of Autonomy Corporation plc ("Autonomy"). As of October 31, 2011, HP owned an approximately 99% equity interest in Autonomy, and HP expects to acquire a 100% equity interest before the end of the first quarter of fiscal 2012. Autonomy is a provider of infrastructure software for the enterprise. HP reports the financial results of the Autonomy business in the HP Software segment. The acquisition date fair value consideration of $11 billion consisted of cash paid for outstanding common stock, convertible bonds, vested in-the-money stock awards and the estimated fair value of earned unvested stock awards assumed by HP. In connection with this acquisition, HP recorded approximately $6.6 billion of goodwill and amortizable purchased intangible assets of $4.6 billion. HP is amortizing the purchased intangible assets on a straight-line basis over an estimated weighted-average life of 8.8 years.

***

Services net revenue increased 1.2% (decreased 1.3% when adjusted for currency) in fiscal 2011 due to revenue increases in Infrastructure Technology Outsourcing and Technology Services. Infrastructure Technology Outsourcing net revenue increased by 2% in fiscal 2011. An increase in product-related revenue and a favorable currency impact were partially offset by a shortfall in short-term project contracts with existing clients. Technology services net revenue increased by 2% in fiscal 2011, due primarily to growth in our consulting business and a favorable currency impact, the effect of which was partially offset by reduced sales of third-party hardware. Applications Services net revenue increased by 1% in fiscal 2011.

16

The increase was driven by a favorable currency impact, the effect of which was partially offset by declines in short-term project work and weakness in public sector spending. Business Process Outsourcing new revenue decreased by 7% in fiscal 2011 due primarily to the ExcellerateHRO divestiture completed at the end of the third quarter of fiscal 2010.

Services earning from operations as a percentage of net revenue decreased by 1.6 percentage points in fiscal 2011. Operating margin decreased due primarily to lower than expected revenue, rate concessions arising from recent contract renewals, a lower than expected resource utilization rate and a higher mix of lower-margin Infrastructure Technology Outsourcing revenue. The decrease in operating margin was partially offset by a reduction in bad debt expense and a continued focus on operating improvements and cost initiatives that favorably impacted the cost structure of both our enterprise services and technology services businesses.

41.    On February 22, 2012, the Company issued a press release announcing financial results for the first quarter ended January 31, 2012. For the quarter, the Company reported net earnings of $1.5 billion, or $0.73 diluted EPS, and net revenue of $30 billion as compared to net earnings of $2.6 billion, or $1.17 diluted EPS, and net revenue of $32.3 billion for the same period a year ago. For the Company's Software segment, "revenue grew 30% year over year with a 17.1% operating margin, including the results of Autonomy. Software revenue was driven by 12% license growth, 22% support growth and 108% growth in services."

42.    Also on February 22, 2012, the Company conducted a conference call with analysts. During the call, Defendant Whitman represented the following:

In Services, year-over-year revenues were up 1% while operating margin declined to 10.5%. This continuing margin pressure is Services really goes straight to a couple of our major challenges, like resource utilization and business mix. We're focused on transitioning to more profitable services while enhancing our systems, processes and sales force. Last quarter, we characterized Services as a longterm effort. That journey continues.

In Software, with the addition of Autonomy, revenue grew 30% year-over-year with a 17.1% operating margin. *The Autonomy acquisition is going well*. And we're continuing to grow our set of assets from Information Management to our IT Performance Suite including security, management of hybrid clouds and Application Lifecycle Management. Software is a critical part of our portfolio and of our forward-looking strategy. It amplifies, differentiates, optimizes and secures our core infrastructure, builds on our solution capabilities and expands customer relationships.

17

43. During the call, Defendant Lesjak represented the following:

So the performance that we delivered [in Services] was in line with the expectations that we set last quarter, and I think that that's an important point. So there shouldn't be any surprises here on that. Revenues in Services did grow 1%, it was flat, on a reported basis it was flat in constant currency while the cost structure increased due to the necessary investments that we've been talking about in service delivery, in basically building out our bench and in investing to build out our strategic enterprise services. And I put – the services that we put in that category are services around cloud, analytics and security, as well as apps modernization. And those are the higher growth, higher margin services that we need to invest into and convert this business from being less ITO heavy where the margins are not as good, and in some service lines within ITO, the margins are very unattractive and we're deemphasizing some of the revenue in that space.

44. On March 12, 2012, HP filed a quarterly report for the period ended January 31, 2012 on Form 10-Q with the SEC, which was signed by Defendant Lesjak and reiterated the Company's previously announced financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Whitman and Lesjak stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

45. The Form 10-Q stated the following in relevant part:

Additionally, during the three months ended January 31, 2012, HP recorded additional goodwill of $224 million in the Software segment due to a change in the estimated fair values of purchased intangible assets and net tangible assets associated with the acquisition of Autonomy Corporation plc ("Autonomy"). This increase to goodwill was partially offset by a currency translation adjustment of $106 million on goodwill related to Autonomy subsidiaries whose functional currency is not the U.S. dollar.

***

For the first three months of fiscal 2012, the majority of the decrease in gross intangibles was related to a $293 million change in the estimated fair value of Autonomy's purchased intangible assets acquired, $104 million of fully amortized intangible assets which have been eliminated from both the gross and accumulated amortization amounts, and a $92 million reduction in intangibles due to currency translation on intangibles related to Autonomy subsidiaries whose functional currency is not the U.S. dollar.

18

***

The Software segment contributed favorably to the total HP net revenue change primarily as a result of the acquisition of Autonomy Corporation plc.

***

Services net revenue increased 1.1% (0.3% when adjusted for currency) for the three months ended January 31, 2012 due to revenue increases in Infrastructure Technology Outsourcing and Technology Services. Infrastructure Technology Outsourcing net revenue increased by 2% due to an increase in product-related revenue and a favorable currency impact, the effect of which was partially offset by a decline in shortterm project contracts with existing clients. Net revenue in Technology Services increased by 2% due primarily to growth in our consulting and support businesses, the effect of which was partially offset by reduced sales of third-party hardware. Application and Business Services net revenue was flat due primarily to a decline in short-term project work, the effect of which was offset by a favorable currency impact.

Services earnings from operations as a percentage of net revenue decreased by 5.7 percentage points in the three months ended January 31, 2012. Operating margin decreased due primarily to rate concessions arising from contract renewals, investments in service delivery and sales headcount and additional costs associated with contract deliverable delays.

***

Software net revenue increased 30.5% (29.1% when adjusted for currency) for the three months ended January 31, 2012 due to revenues from acquired companies, primarily Autonomy, as well as growth in the organic business. Net revenue from services, support and licenses increased by 108%, 22% and 12%, respectively.

46.     On May 23, 2012, the Company issued a press release announcing financial results for the second fiscal quarter ended April 30, 2012.  For the quarter, the Company reported net earnings of $3 billion, or $1.53 diluted EPS, and net revenue of $30.7 billion as compared to net earnings of $5 billion, or $2.23 diluted EPS, and net revenue of $31.6 billion for the same period a year ago.

47.     On May 23, 2012, the Company held a conference call with analysts.  Defendant Whitman admitted that "Autonomy had a very disappointing license revenue quarter with a significant decline year-over-year resulting in a shortfall to our expectations."   Further,

Defendant Whitman disclosed the following:

> To help improve Autonomy's performance, Bill Veghte, HP's Chief Strategy Officer and Executive Vice President of HP Software, will step in to lead Autonomy. Mike Lynch, Autonomy's Founder and Executive Vice President for Information Management will leave HP after a transition period. The market and competitive position for Autonomy remains strong, particularly in cloud offerings, and we have been flooded with a number of big deal leads. Bill is an experienced software leader, who will develop the right processes and discipline to scale Autonomy and fulfill its promise, although it will take a few quarters to see tangible improvement.

***

> Turning to Services, revenues were essentially flat year-over-year in constant currency and we stabilized margins. While margins may fluctuate quarter-to-quarter, we believe that a 10% to 12% range is the right sustainable profit margin profile for Services through the remainder of fiscal year 2012. We're focused on building out strategic practice areas, in cloud, security, information management, and application transformation. And we're strengthening the industry alignment of our Services business, which will help us better solve customer challenges, create more customer value and deepen customer relationships. We're excited about growing these higher-margin categories, but this is a business that continues to be challenged. It's a journey, and we have a lot of work ahead of us in this turnaround.

48.     On June 8, 2012, HP filed a quarterly report for the period ended April 30, 2012 on Form 10-Q with the SEC, which was signed by Defendant Lesjak and reiterated the Company's previously announced financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Lesjak and Whitman stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.     The Form 10-Q stated the following in relevant part:

> During the six months ended April 30, 2012, HP recorded additional goodwill of $224 million in the Software segment due to a change in the estimated fair values of purchased intangible assets and net tangible assets associated with the acquisition of Autonomy Corporation plc ("Autonomy"). HP also recorded a net increase to goodwill of $213 million as a result of a currency translation adjustment on goodwill related to Autonomy subsidiaries whose functional currency is not the U.S. dollar.

\*\*\*

For the first six months of fiscal 2012, the majority of the decrease in gross intangibles was related to $428 million of fully amortized intangible assets which have been eliminated from both the gross and accumulated amortization amounts and a $293 million change in the estimated fair value of Autonomy's purchased intangible assets acquired. The decrease to intangibles was partially offset by a net currency translation adjustment of $165 million on intangibles related to Autonomy subsidiaries whose functional currency is not the U.S. dollar.

\*\*\*

The Software segment contributed favorably to the total HP net revenue change primarily as a result of the acquisition of Autonomy Corporation plc.

\*\*\*

Services net revenue decreased 1% (0.3% when adjusted for currency) for the three months ended April 30, 2012 and was flat both as reported and in constant currency for the six months ended April 30, 2012, respectively. Application and Business Services net revenue increased by 1% and remained flat for the three and six months ended April 30, 2012, respectively. The revenue increase was due primarily to an increase in short-term project work as well as an increase in sales of cloud offerings, the effect of which was offset by a reduction in contract renewals. Technology Services net revenue remained flat for the three months ended April 30, 2012. Technology Services net revenue increased by 1% for the six months ended April 30, 2012, due primarily to growth in our consulting and support businesses. Infrastructure Technology Outsourcing net revenue decreased by 3% and 1% for the three and six months ended April 30, 2012, respectively. Lower rates on contract renewals for both periods, along with increased deal selectivity designed to meet threshold margins for new contracts, contributed to the decrease in revenues.

50.     On August 8, 2012, the Company issued a press release announcing that it expects "to record a non-cash pre-tax charge for the impairment of goodwill within its Services segment of approximately $8 billion in the third quarter of its fiscal 2012." The press release further stated the following in relevant part:

The impairment review stems from the recent trading values of HP's stock, coupled with market conditions and business trends within the Services segment. Under accounting rules, when indicators of potential impairment are identified, companies are required to conduct a review of the carrying amounts of goodwill and other long-lived assets to determine if an impairment exists.

HP does not expect this estimated goodwill impairment charge to result in any future cash expenditures or otherwise affect the ongoing business or financial performance of its Services segment.

51.    On August 22, 2012, the Company issued a press release announcing financial results for the third fiscal quarter ended July 31, 2012.  For the quarter, the Company reported net loss of $8.9 billion, or ($4.49) diluted EPS, and net revenue of $29.7 billion as compared to net earnings of $1.9 billion, or $0.93 diluted EPS, and net revenue of $31.2 billion for the same period a year ago.  Moreover, the Company's financial results included a goodwill impairment charge of $8 billion associated with the Services segment.

52.    On August 22, 2012, the Company held a conference call with analysts. Defendant Whitman represented the following:

> Now, let me outline some areas where we're not where we need to be. While Enterprise Services performance in the third quarter was within our expectations, there's still a lot of work that needs to be done. Earlier this month we announced a change in leadership at ES with Mike Nefkens stepping in to lead on an acting basis. Mike is an experienced leader who has led IT transformations for a number of our largest accounts.
>
> ***
>
> Autonomy still requires a great deal of attention and we've been aggressively working on that business. Among the many changes we've instituted is a global dashboard to track Autonomy's pipeline. A single global sales methodology, A single HP Services engagement process, and a global process to measure client satisfaction and service delivery progress. These actions are designed to help deliver predictable results and improve after-sale customer satisfaction.

53.    During the call, Defendant Lesjak represented the following:

> Moving on to Services. As we announced on August 8, we are recording a GAAP only non-cash pretax charge of approximately $8 billion for the impairment of goodwill within the Services segment. The impairment stems from the recent trading values of HP stock coupled with market conditions and business trends within the Services segment. We do not expect this goodwill impairment charge to result in any future cash expenditures or otherwise affect the ongoing business or financial performance of the Services segment.
>
> In the third quarter, Services delivered revenue of $8.8 billion, down 3% from the prior year and up 1% in constant currency. Operating profit of $959 million was 11%

of revenue, down 2.7 points from the prior year, but still within our expected range of 10% to 12%. The year-over-year decline was due to the unfavorable impact of resource management and account performance and runoff, somewhat offset by an improvement in the cost of Services delivery.

54.     On these news, HP stock declined $1.57 per share or more than 8%, to close at $17.64 per share on August 23, 2012.

55.     On September 10, 2012, HP filed a quarterly report for the period ended July 31, 2012 on Form 10-Q with the SEC, which was signed by Defendant Lesjak and reiterated the Company's previously announced financial results.    In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Lesjak and Whitman stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

56.     The Form 10-Q stated the following in relevant part:

Additionally, HP recorded an increase to goodwill of $249 million in the Software segment due to a change in the estimated fair values of purchased intangible assets and net tangible assets associated with the acquisition of Autonomy Corporation plc ("Autonomy").

***

The Software segment includes $14.6 billion of goodwill, of which $7.7 billion relates to the legacy HP software business and $6.9 billion relates to the Autonomy acquisition. Based on HP's last annual goodwill impairment review completed as of August 1, 2011, the excess of fair value over carrying value of the legacy HP software business was 38% of the carrying value, which is lower than that of HP's other reporting units. At the time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying value.

***

For the first nine months of fiscal 2012, the majority of the decrease in gross intangibles was related to $537 million of fully amortized intangible assets which have been eliminated from both the gross and accumulated amortization amounts and a $293 million change in the estimated fair value of Autonomy's purchased intangible assets acquired.

***

The Software segment contributed favorably to the total HP net revenue change as a result of the acquisition of Autonomy Corporation plc.

*\*\**

Services net revenue decreased 3.1% (increased 1.0% when adjusted for currency) and 1.0% (increased 0.4% when adjusted for currency) for the three and nine months ended July 31, 2012, respectively. ITO net revenue decreased by 6% and 3% for the three and nine months ended July 31, 2012, respectively. Contractual rate declines on ongoing contracts, increased deal selectivity designed to meet threshold margins and strategic fit, and an unfavorable currency impact contributed to the decrease in revenues for both the periods. TS net revenue decreased by 1% and remained flat for the three and nine months ended July 31, 2012, respectively. The decrease for the three months ended July 31, 2012 was due primarily to revenue declines in our support business driven by an unfavorable currency impact, the effect of which was partially offset by growth in our consulting business. ABS net revenue remained flat for both the three and nine months ended July 31, 2012, respectively. An increase in sales of cloud and information management and analytics offerings were offset by a reduction in contract renewals as well as unfavorable currency impacts.

Services earnings from operations as a percentage of net revenue for the three and nine months ended July 31, 2012 decreased by 2.7 percentage points and 4.2 percentage points, respectively. Operating margin decreased for both periods due primarily to contractual rate declines on ongoing contracts, a lower resource utilization rate and additional costs associated with certain contract deliverable delays. The decrease in operating margin was partially offset by a continued focus on operating improvements and cost initiatives that favorably impacted the cost structure of both our enterprise services and technology services businesses.

*\*\**

Software net revenue increased 18.4% (21.0% when adjusted for currency) and 23.3% (23.7% when adjusted for currency) for the three and nine months ended July 31, 2012, respectively. The net revenue increase for both periods was due to revenues from acquired companies, primarily Autonomy. For the three months ended July 31, 2012, net revenue from services, support and licenses increased by 65%, 16% and 2%, respectively. For the nine months ended July 31, 2012, net revenue from services, support and licenses increased by 81%, 18% and 7%, respectively.

For the three and nine months ended July 31, 2012, Software earnings from operations as a percentage of net revenue decreased by 1.5 percentage points and 1.1 percentage points, respectively. The operating margin decrease for both periods was due primarily to a lower mix of license revenue, higher deferred revenue write-downs and integration costs associated with the Autonomy acquisition, the effects of which were partially offset by rate increases in hosted license services and lower deferred revenue write-downs associated with our fiscal 2010 acquisitions than in the prior-year periods.

57.    The statements referenced in ¶¶ 25-31; 33-53; 55-56 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) at the time the Company acquired Autonomy, Autonomy's reported operating results and historic growth were the product of accounting improprieties, including the mischaracterization of revenue from negative-margin, low-end hardware sales with little or no associated software content as "IDOL product and the improper recognition of revenue on transactions with business partners where no end-user customers existed at the time of sale; (ii) at the time the Company had agreed in principle to acquire Autonomy, HP was looking to unwind the deal due to potential accounting improprieties discovered in Autonomy's financial statements; (iii) the Company engaged in inadequate due diligence during the Autonomy acquisition and, as a result thereof, the Company materially overpaid for Autonomy; (iv) the Company's reported goodwill and acquired intangible assets were overstated and would have to be written down; (v) Autonomy's operating margin for its Enterprise Services segment was collapsing for several reasons, including unfavorable revenue mix and underperforming contracts; and (vi) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.   Moreover, the statements referenced in ¶¶ 46-53; 55-56 above were materially false and misleading because, as a result of detailed allegations of fraud provided by a whistleblower former employee of Autonomy, as early as May 2012, HP had commenced an internal investigation regarding potential accounting manipulations at Autonomy.

### The Truth Begins to Emerge

58.    On October 3, 2012, the Company held an Analyst Meeting where it gave a presentation showing that by August 2011, HP's Enterprise Services' operating margin had

already decreased nearly 500 basis points from 10% to 5% on $6 billion in quarterly revenue. Further, the presentation revealed that by October 2012, Enterprise Services' operating margin had deteriorated by another 40%, or to 3% on $6 billion in quarterly revenue. The Company further reported that its Services segment's 2013 revenue would slide by 11% to 13% and that operating margins were expected to be in the range of 0% to 3%.

59.     On this news, HP stock declined $2.22 per share or nearly 13%, to close at $14.91 per share on October 3, 2012.

60.     On November 20, 2012, the Company issued a press release announcing financial results for the fourth fiscal quarter and full year ended October 31, 2012. For the quarter, the Company reported net loss of $6.9 billion, or ($3.49) diluted EPS, and net revenue of $30 billion as compared to net earnings of $239 million, or $0.12 diluted EPS, and net revenue of $32 billion for the same period a year ago. For the full year, the Company reported net loss of $12.7 billion, or ($6.41) diluted EPS, and net revenue of $120.4 billion as compared to net earnings of $7.1 billion, or $3.32 diluted EPS, and net revenue of $127 billion for the same period a year ago.

61.     That same day, the Company issued a press release disclosing a non-cash impairment charge of $8.8 billion related to the acquisition of Autonomy. Significantly, the Company revealed that more than $5 billion of the impairment charge was "is linked to serious accounting improprieties, misrepresentation and disclosure failures" made by Autonomy in the anticipation of the HP acquisition. In addition, the Company disclosed that as a result of reports by a whistleblower who was a former executive at HP, in May 2012, it had launched an internal investigation into improper accounting practices at Autonomy. The press release disclosed the following in relevant part:

26

"HP is extremely disappointed to find that some former members of Autonomy's management team used accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company, prior to Autonomy's acquisition by HP. These efforts appear to have been a willful effort to mislead investors and potential buyers, and severely impacted HP management's ability to fairly value Autonomy at the time of the deal. We remain 100 percent committed to Autonomy and its industry-leading technology."

Additional background:

HP today announced a non-cash impairment charge of $8.8 billion related to Autonomy in the fourth quarter of its 2012 fiscal year. The majority of this impairment charge, more than $5 billion, is linked to serious accounting improprieties, misrepresentation and disclosure failures discovered by an internal investigation by HP and forensic review into Autonomy's accounting practices prior to its acquisition by HP. The balance of the impairment charge is linked to the recent trading value of HP stock and headwinds against anticipated synergies and marketplace performance.

HP launched its internal investigation into these issues after a senior member of Autonomy's leadership team came forward, following the departure of Autonomy founder Mike Lynch, alleging that there had been a series of questionable accounting and business practices at Autonomy prior to the acquisition by HP. This individual provided numerous details about which HP previously had no knowledge or visibility.

HP initiated an intense internal investigation, including a forensic review by PricewaterhouseCoopers of Autonomy's historical financial results, under the oversight of John Schultz, executive vice president and general counsel, HP.

As a result of that investigation, HP now believes that Autonomy was substantially overvalued at the time of its acquisition due to the misstatement of Autonomy's financial performance, including its revenue, core growth rate and gross margins, and the misrepresentation of its business mix.

Although HP's investigation is ongoing, examples of the accounting improprieties and misrepresentations include:

- The mischaracterization of revenue from negative-margin, low-end hardware sales with little or no associated software content as "IDOL product," and the improper inclusion of such revenue as "license revenue" for purposes of the organic and IDOL growth calculations.

  - This negative-margin, low-end hardware is estimated to have comprised 10-15% of Autonomy's revenue.

- The use of licensing transactions with value-added resellers to inappropriately accelerate revenue recognition, or worse, create revenue where no end-user customer existed at the time of sale.

This appears to have been a willful effort on behalf of certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers. These misrepresentations and lack of disclosure severely impacted HP management's ability to fairly value Autonomy at the time of the deal.

62.     The Company also held a conference call to discuss its financial results.  In regard to the impairment charge, Defendant Whitman stated the following in relevant part:

The majority of this impairment charge is linked to serious accounting improprieties, disclosure failures and outright misrepresentations that occurred prior to HP's acquisition of Autonomy, and the associated impact on the expected financial performance of the business over the long-term.  The balance of the impairment charge is linked to the recent trading value of HP stock.

These improprieties were discovered through an internal investigation after a senior member of Autonomy's leadership team came forward following the departure of Mike Lynch on May 23. Based on this information, HP initiated an intense internal investigation into the allegations, including a third-party forensic review of Autonomy's historically financial results.

HP has contacted the SEC's Enforcement Division and the U.K's Serious Fraud Office.   We have requested that both agencies open criminal and civil investigations into this matter.  In addition, HP intends to seek redress against various parties in the appropriate civil courts to recoup what we can for our shareholders.

63.     On this news, HP stock dropped $1.59 per share or nearly 12%, to close at $11.74 per share on November 20, 2012.

64.     On November 20, 2012, *The Wall Street Journal* ("WSJ") published an article entitled, "H-P Says It was Duped, Takes $8.8 Billion Charge."  Specifically, the article stated that members of HP's due diligence team noted potential accounting irregularities at Autonomy at the time of the merger, and even considered scuttling the Autonomy deal as a result.  The article stated, in relevant part:

H-P General Counsel John Schultz said the internal investigation into the Autonomy deal began in May when he told Ms. Whitman he had just spoken with a senior executive in the Autonomy software business, who had alleged that executives at Autonomy had been cooking the books before the acquisition. The identity of that senior executive couldn't be determined.

A spokesman for Autonomy's accounting firm, Deloitte LLP, said Tuesday: "Deloitte UK categorically denies that it had any knowledge of any accounting improprieties or any misrepresentations in Autonomy's financial statements, or that it was complicit in any accounting improprieties or misrepresentations."

***

H-P said Tuesday that Autonomy, before it was acquired, had mischaracterized some sales of low-margin hardware as software and had recognized some deals with partners as revenue, even when a customer never bought the product.

At least one year before the H-P acquisition, an Autonomy executive brought concerns about the company's accounting practices to U.S. regulators including the SEC, according to people familiar with the matter. Autonomy didn't trade on U.S. exchanges prior to the H-P deal, so it is unclear whether U.S. agencies had jurisdiction.

H-P's internal team was aware of talk about accounting irregularities at the time the deal was struck, people familiar with the matter have said. At the time, one of these people said, H-P was looking for a way to unwind the deal before it closed, but couldn't find any material accounting issues.

***

In May 2012, Mr. Lynch left H-P. Shortly after, the unidentified Autonomy senior executive approached Mr. Schultz. Mr. Schultz said that during a phone call to discuss other matters, the Autonomy executive asked to speak with him in person.

The pair met in a conference room at H-P's Palo Alto headquarters, where the executive provided an outline of the alleged accounting fraud, Mr. Schultz said. The executive later provided some emails and financial information that Mr. Schultz said substantiated the claim.

Working with auditing firm PricewaterhouseCoopers LLP, an H-P team re-created Autonomy's books. People familiar with the investigation said that the team found that for at least two years, Autonomy booked sales of low-margin hardware products as software and would label the cost of that hardware as marketing or other expenses, which made products appear faster growing and more profitable than they really were.

In late June 2012, Mr. Lynch met with H-P to discuss issues including "transition and obligations to the company," said Mr. Lynch's spokeswoman. She added that at the meeting, he was asked about the operation of a small number of deals, which he explained.

65.    On November 26, 2012, *WSJ* published an article entitled, "Long Before H-P Deal, Autonomy's Red Flags" where it discussed Autonomy's aggressive accounting practices and corporate culture.    The article noted that several analysts had questioned Autonomy's accounting practices well in advance of the merger.  Specifically, the article stated the following in relevant part:

> Interviews in California and England with former Autonomy employees, business partners and attorneys close to the case paint a picture of a hard-driving sales culture shaped by Mr. Lynch's desire for rapid growth. They describe him as a domineering figure, who on at least a few occasions berated employees he believed weren't measuring up.

> Along the way, these people say, Autonomy used aggressive accounting practices to make sure revenue from software licensing kept growing—thereby boosting the British company's valuation. The firm recognized revenue upfront that under U.S. accounting rules would have been deferred, and struck "round-trip transactions"—deals where Autonomy agreed to buy a client's products or services while at the same time the client purchased Autonomy software, according to these people.

> "The rules aren't that complicated," said Dan Mahoney of accounting research business CFRA, who covered Autonomy until it was acquired. He said that Autonomy had the hallmarks of a company that recognized revenue too aggressively. He said neither U.S. nor international accounting rules would allow companies to recognize not-yet collected revenue from customers that might be at risk not to pay, which he said appears to be the case in some of Autonomy's transactions.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired HP securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the

Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

67.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HP securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by HP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

68.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

69.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

70.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Autonomy and/or HP;

- whether the Individual Defendants caused Autonomy and/or HP to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of HP securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

71. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

72. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- HP securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold HP securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

32

73.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

74.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

76.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HP securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire HP securities and options at artificially inflated prices.    In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

77.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the

quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for HP securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about HP's finances and business prospects.

78. By virtue of their positions at HP and/or Autonomy, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

79. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of HP securities from their personal portfolios.

80. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of HP and/or Autonomy, the Individual Defendants had knowledge of the details of Autonomy and/or HP's internal affairs.

81. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual

Defendants were able to and did, directly or indirectly, control the content of the statements of HP and/or Autonomy. As officers and/or directors of publicly-held companies, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Autonomy and/or HP's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of HP securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning HP's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired HP securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

82. Defendant Deloitte fraudulently certified the financial statements contained in each of Autonomy's annual reports, without qualification, despite having actual knowledge of, or at least recklessly disregarding, the fact that the financial statements violated International Financial Reporting Standards and the Companies Act 2006 and were materially false and misleading. As a result of Deloitte's materially misleading Independent Auditor Reports, which were incorporated into the HP's Offering Documents and financial statements, the price of HP's securities traded at inflated prices.

83. During the Class Period, HP securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of HP securities at prices artificially inflated by defendants' wrongful conduct. Had

Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of HP securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of HP securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

84. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

85. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

86. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87. During the Class Period, the Individual Defendants participated in the operation and management of Autonomy and/or HP, and conducted and participated, directly and indirectly, in the conduct of Autonomy and/or HP's business affairs. Because of their senior

positions, they knew the adverse non-public information about Autonomy and/or HP's misstatement of income and expenses and false financial statements.

88.     As officers and/or directors of publicly owned companies, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Autonomy and/or HP's financial condition and results of operations, and to correct promptly any public statements issued by Autonomy and/or HP which had become materially false or misleading.

89.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Autonomy and/or HP disseminated in the marketplace during the Class Period concerning Autonomy and/or HP's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Autonomy and/or HP to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Autonomy and/or HP within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of HP securities.

90.     Each of the Individual Defendants, therefore, acted as a controlling person of Autonomy and/or HP.  By reason of their senior management positions and/or being directors of Autonomy and/or HP, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Autonomy and/or HP to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Autonomy and/or HP and possessed the power to control the specific

1  activities which comprise the primary violations about which Plaintiff and the other members of

2  the Class complain.

3      91.    By reason of the above conduct, the Individual Defendants are liable pursuant to

4

5  Section 20(a) of the Exchange Act for the violations committed by Autonomy and/or HP.

6                              **PRAYER FOR RELIEF**

7      **WHEREFORE**, Plaintiff demands judgment against defendants as follows:

8      A.    Determining that the instant action may be maintained as a class action under

9
10  Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class

11  representative;

12      B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by

13  reason of the acts and transactions alleged herein;

14      C.    Awarding Plaintiff and the other members of the Class prejudgment and post-

15
16  judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

17      D.    Awarding such other and further relief as this Court may deem just and proper.

18                          **DEMAND FOR TRIAL BY JURY**

19  Plaintiff hereby demands a trial by jury.

20  Dated: November 30, 2012              Respectfully submitted,

21

22                                       **THE WAGNER FIRM**

23

24  By: _____

25  Avi Wagner
    1925 Century Park East, Suite 2100
26  Los Angeles, CA 90067
    Tel: (310) 491-7949   Email:
27  avi@thewagnerfirm.com

28

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Marc I. Gross
Jeremy A. Lieberman
600 Third Avenue -  20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, ___DAVIN POKOIK_____, make this declaration pursuant to Section 27(a)(2) of

the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934

("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Hewlett Packard Company ("Hewlett Packard" or the

"Company"), and authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3.  I did not purchase or acquire Hewlett Packard securities at the direction of plaintiffs counsel or in

order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or

acquired Hewlett Packard securities during the class period, including providing testimony at deposition and

trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this

action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Hewlett

Packard securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed _____
                (Date)

_____
                (Signature)

_____
        (Type or Print Name)

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 8/20/12 | Sold Puts HPQ 19 | 30 CONTRACTS | .35 |
| 8/24/12 | Purchase (assignment) | 3,000 | 19 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |